**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

JEFFREY T. ROSEN,
Plaintiff-Appellant,

v.

MONTGOMERY COUNTY MARYLAND,

No. 96-1833

Defendant-Appellee,

and

NEAL POTTER, County Executive,
Defendant.

Appeal from the United States District Court
for the District of Maryland, at Greenbelt.
Alexander Williams, Jr., District Judge.
(CA-94-3356-AW)

Argued: April 10, 1997

Decided: July 31, 1997

Before HALL and NIEMEYER, Circuit Judges, and
DUFFY, United States District Judge for the
District of South Carolina, sitting by designation.

_____

Affirmed by published opinion. Judge Hall wrote the opinion, in
which Judge Niemeyer and Judge Duffy joined.

_____

**COUNSEL**

**ARGUED:** Marc P. Charmatz, NATIONAL ASSOCIATION OF
THE DEAF LAW CENTER, Silver Spring, Maryland, for Appellant.

Clifford Lee Royalty, Assistant County Attorney, Rockville, Maryland, for Appellee. **ON BRIEF:** Sarah S. Geer, Laura L. Rovner, NATIONAL ASSOCIATION OF THE DEAF LAW CENTER, Silver Spring, Maryland; Jerry R. Goldstein, GOLDSTEIN, HANDLER & WHITE, P.C., Bethesda, Maryland, for Appellant. Charles W. Thompson, Jr., County Attorney, Linda B. Thall, Senior Assistant County Attorney, Rockville, Maryland, for Appellee.

_____

**OPINION**

HALL, Circuit Judge:

Jeffrey T. Rosen, who is deaf, sued Montgomery County, Maryland, under the Americans with Disabilities Act (ADA), § 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794), and 42 U.S.C. § 1983, for injuries suffered during and as a result of his arrest for drunk driving. The district court granted summary judgment to the County on all claims, and Rosen appealed. We affirm.

I

A

In 1994, Rosen was stopped by a County policeman for erratic driving. He failed a field sobriety test and, after signing a consent form, failed a breath test. He was then arrested and taken to the station house, where he signed a form that explained his rights and gave consent to a chemical test. The test registered a reading indicating a blood-alcohol content above the legal limit. He was then driven home. He claims that the police made no attempt to communicate in writing and that they ignored his requests for an interpreter and for a TTY telephone so he could call a lawyer.

B

Rosen met with Donald McGean, a County employee, to discuss the possibility of enrolling in REDDO,[1] a diversionary program

_____

[1] REDDO is an acronym for "Rehabilitation and Education for Drinking Driver Offender." Under the REDDO program, the County refers

2

offered to first-time offenders. The County provided an interpreter for this meeting. Rosen alleges that McGean told him that he (Rosen) would have to provide his own interpreter for a local REDDO program or have the judge order the County to provide one, but that in any event the County would not pay for an interpreter. McGean testified in a deposition that he was "pretty sure" that he told Rosen about a private contractor, Family Service Foundation (FSF), that provided a program to hearing-impaired persons in neighboring Prince George's County. Rosen signed a form that stated that he agreed to participate in an "alcohol education program," to which was added in handwriting, "in sign language." Rosen asserts that McGean never told him about the FSF program.

C

When he appeared in state court to answer the drunk driving charge, Rosen requested that the court order the County to provide an interpreter so he could attend a REDDO program. The judge denied the request, and Rosen pleaded guilty. He was given probation before judgment, fined, and ordered to attend six Alcoholics Anonymous meetings as a condition of having his conviction expunged. Rosen did attend the AA meetings, though without an interpreter.

II

Rosen brought his ADA claim**2** under the "public services" subchapter, 42 U.S.C. § 12131 et seq. Section 12132 provides:

_____

first-time offenders to various privately operated alcohol treatment and education programs. The County does not run any such education programs itself. The cost of these programs to the clients is based on their income.

**2** Rosen's Rehabilitation Act claims parallel the ADA claims. For convenience' sake, we combine the analysis of the two statutes. See Shafer v. Preston Memorial Hosp. Corp., 107 F.3d 274, 276 n.3 (4th Cir. 1997). Rosen's § 1983 claim is that the County failed to adequately train its police officers regarding the ADA's requirements and that this failure-to-train resulted in a denial of his due process and equal protection rights under the 14th Amendment. We agree with the district court that this claim hinges on, at the minimum, a ruling that Rosen's ADA rights were violated.

> [N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

The County is a public entity within the meaning of § 12131(a), and Rosen has adduced sufficient evidence that he has a "disability" as that term is defined in 42 U.S.C. § 12102(2). Rosen's claim comprises two distinct parts, the arrest and the REDDO program.

The district court ruled that the ADA does not require the police to provide interpreters or TTY telephones to arrestees. In addition, the court found that the policemen were trained to communicate with deaf persons and, in any event, that the arresting officers reasonably thought that they could communicate with Rosen without auxiliary aids.

With regard to the REDDO claim, the court ruled that Rosen had created no genuine dispute about two factual components. First, the court found that the County refers all hearing-impaired persons eligible for REDDO to FSF and that Rosen had been informed about the FSF program by McGean. Second, the court rejected Rosen's argument that the County was obligated to provide a REDDO program "accommodating the time and location preferences of the Plaintiff."

We review a district court's grant of summary judgment de novo. See Higgins v. E.I. DuPont de Nemours & Co., 863 F.2d 1162, 1167 (4th Cir. 1988). We affirm the judgment below, though under an analysis that is slightly different in a few respects. See Shafer, 107 F.3d at 275 n.1 ("We have consistently recognized that we may affirm a district court's decision on different grounds than those employed by the district court.") (citations omitted). We will treat the arrest and REDDO portions of Rosen's claim separately.**3**

_____

**3** As a preliminary matter, we reject the County's first argument that there is no respondeat superior liability under the ADA and that the County can only be held for a policy of discrimination. Under the ADA and similar statutes, liability may be imposed on a principal for the statutory violations of its agent. See, e.g., Birbeck v. Marvel Lighting Corp., 30 F.3d 507, 510-11 (4th Cir. 1994) (ADEA); EEOC v. AIC Sec. Investigations, Ltd., 55 F.3d 1276, 1279 (7th Cir. 1995) (ADA); Bonner v. Lewis, 857 F.2d 559, 566-567 (9th Cir. 1988) (Rehabilitation Act).

4

III

In his "Statement of Material Facts in Dispute," filed in opposition to the County's motion for summary judgment, Rosen pointed out that there remained factual disputes as to whether the police ignored his requests for writing materials or an interpreter, whether he understood the policeman's instructions, and whether the police received adequate training in dealing with deaf persons. The claimed violation of the ADA is the failure of the police to have and use "auxiliary aids and services" on the street and at the stationhouse "for use in stopping, detaining and/or arresting individuals with hearing impairments," and the claimed injury is the humiliation and embarrassment he suffered by not being able to communicate with the police officers. Appellant's brief at 9. His argument is weak on a number of fronts.

A

The most obvious problem is fitting an arrest into the ADA at all. Section 12131(b) defines "[q]ualified individual with a disability" as "an individual with a disability who, with or without . . . the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." Rosen clearly has a disability, but calling a drunk driving arrest a "program or activity" of the County, the "essential eligibility requirements" of which (in this case) are weaving in traffic and being intoxicated, strikes us as a stretch of the statutory language and of the underlying legislative intent. See Gorman v. Bartch, 925 F.Supp. 653, 655 (W.D.Mo. 1996) ("It stretches the statute to talk about the Plaintiff's `eligibility' to be arrested and taken to jail or to participate in being arrested . . . ."); cf. Torcasio v. Murray, 57 F.3d 1340, 1347 (4th Cir. 1995) ("The terms `eligible' and `participate' imply voluntariness on the part of an applicant who seeks a benefit from the State; they do not bring to mind prisoners who are being held against their will."), cert. denied, 116 S.Ct. 772 (1996).

Rosen points to nothing in the ADA itself or in the regulations that specifically bring arrests within the ADA's ambit, despite the fact that such "program or activity" is one that is "participated in" by millions of persons every year. The closest he can come to an express inclu-

5

sion of arrests is a 1980 "analysis of final rule," issued in conjunction with the regulations under the Rehabilitation Act, that notes that "law enforcement agencies should provide for the availability of qualified interpreters to assist the agencies when dealing with hearing impaired persons." 45 Fed. Reg. 37629-30 (June 3, 1980). The analysis also notes that Miranda warnings should be given on a written form "where there is no qualified interpreter immediately available and communication is otherwise adequate" and that a free interpreter should be offered and interrogation deferred until one is obtained. Id. These "requirements" are obviously aimed at complementing the constitutional protections that are aimed at insuring that confessions are voluntarily and intelligently given. Rosen, however, does not contend that his consent to the intoxication tests was the product of his inability to understand the police.

Rosen was in no way "denied the benefits of" his arrest. As far as the police officers were concerned, Rosen adequately participated in the various tests for intoxication, and the officers obtained the information they needed to complete the booking process. Rosen was simply not "discriminated against" just because he could not follow everything the officers were telling him.

If we assume, however, that the police were required to provide auxiliary aids at some point in the process, that point certainly cannot be placed before the arrival at the stationhouse. The police do not have to get an interpreter before they can stop and shackle a fleeing bank robber, and they do not have to do so to stop a suspected drunk driver, conduct a field sobriety test, and make an arrest.

If Rosen signed the consent forms because he felt, as he asserts in his complaint, "intimidated," the criminal justice system has ample protections to guard against such pressures. For example, if a deaf individual in Rosen's situation could demonstrate that the police failed to communicate in certain material respects or that such failure to communicate constituted undue coercion, the evidence obtained might well have to be suppressed in the context of any criminal action. Rosen is simply unable to point to any tangible adverse consequences resulting from the manner of his arrest. **4** Moreover, he does

_____
**4** A Department of Motor Vehicles administrative hearing officer dismissed the license revocation proceeding on the ground that the arresting officers did not communicate with him effectively.

6

not claim that the officers' refusal to use auxiliary aids led in any way to his guilty plea. Our decision to affirm, however, is based on an even more fundamental infirmity: the lack of any discernible injury.

B

What the policemen should have done is beside the point, unless Rosen can show that he was somehow damaged by their failure to communicate. Rosen does not assert that better communication would have changed events one iota, and, in the end, he is forced to fall back on his claim that he was "humiliated and embarrassed." But these are emotions experienced by almost every person stopped and arrested for drunk driving. Rosen, who is a lawyer, failed a field test, signed a form, failed another test, was arrested, signed another form, and failed another test. Without some better indication of precisely what it was that he did not understand, we cannot find an injury that would suffice to invoke the ADA's protections.

IV

The other part of Rosen's ADA claim involves the County's alleged failure to provide interpreter services for the alcohol education programs or to inform him that alternative services were available. This claim, however, evaporated before Rosen left the courtroom where he was sentenced.

The evidence is that the County, including the police department, made fairly extensive use of interpreters.[5] Rosen's own evidence demonstrates that the FSF program was offered to other deaf persons prior to his discussion with McGean.[6] Nevertheless, even if we assume that there is a genuine issue of fact regarding what McGean told him or did not tell him,[7] the fact is not a material one. Again, we need first to determine what the violation and injury being claimed are.

_____

[5] For instance, in 1994, the year in which Rosen was arrested, the County spent $98,253 on interpreter services. J.A. 416.
[6] See deposition of Carol Rose Ethridge, J.A. 266, which was offered by Rosen in support of his summary judgment motion.
[7] The following factors throw doubt on Rosen's version. He met with McGean for two hours with an interpreter, but the interpreter's version

7

Rosen's argument seems to be that had the County provided a free interpreter or, alternatively, had he at least known of the FSF program, he could have represented to the state court he was qualified for a treatment program. The court then would have likely have placed his case on the inactive docket for a year, after which time the case would have been dismissed upon proof that he had completed the treatment program. As it turned out, the court refused to order that the County provide an interpreter and instead required Rosen to attend AA meetings under a "probation before judgment" program. The end result is essentially the same either way; he has no drunk driving record, and he makes no effort to explain how the legal consequences differ.

Rosen seems to be arguing that the ADA requires the County to provide an interpreter at <u>every</u> privately operated education program that is part of REDDO. <u>See</u> appellant's brief 27 ("ADA requires the County to make its REDDO program accessible to deaf individuals."). However, he has made no effort to show that FSF is segregated, inconvenient (or even less convenient), more expensive, or anyhow inferior to other REDDO programs operated in Montgomery County. To the extent, then, that Rosen is insisting that the County be required to provide him with an interpreter so that he can participate in the particular program he desires, we have held that the Rehabilitation Act says otherwise. <u>See Barnett v. Fairfax County School Bd.</u>, 927 F.2d 146, 154 (4th Cir. 1991) (school board not required to "provide every hearing-impaired student with his interpreter of choice at his base school, instead of at mainstreamed but centralized locations . . . .").[8]

_____

of what happened is not in the record. Prior to his meeting, he had spoken to Mauro Ramos, a clinical supervisor at the County DWI Treatment Services Program, which administers the REDDO program. Ramos stated in a deposition that "[a]t all times relevant herein, our office has provided alcohol treatment and counseling to deaf and hearing impaired clients through [FSF]." J.A. 418-19. Finally, Rosen worked with William Ethridge, the father of a woman who had been arrested in 1993 for drunk driving in the County and who had been offered the FSF program with a counselor who could sign. J.A. 266; J.A. 272. It is difficult to believe that not one of these people ever mentioned the FSF program to Rosen.
[8] At appellant's brief at 31, Rosen comments that "disputed issues of fact exist as to the scope of the FSF program, its location, hours, cost,

8

The only claim left would be that (1) McGean forgot to tell him about FSF, therefore (2) he could not tell the court that he had been accepted into a program in which he could fully participate, and, therefore, (3) he ended up at AA, where (4) he was denied the benefits of full and meaningful participation in some educational program. This claim depends entirely on the unwarranted assumption that the court would have placed the case on the inactive docket and would have required Rosen to attend either FSF as the diversionary program (had that program been brought to the court's attention) or another REDDO program for which the County was providing an interpreter.

Finally, Rosen might be complaining about having to suffer the embarrassment of attending the court-ordered AA meetings without an interpreter. If this is the case, his claim would be against the court, an entity over which the County exercises no control whatsoever.

V

With regard to the alleged ADA violations arising from the arrest, we affirm because Rosen has failed to demonstrate that he was injured by such violations. His REDDO-related claim fails because the possibility of any ADA violation blossoming into a claim evaporated when he pleaded guilty and was sentenced by the state court.

AFFIRMED

_____
and accessibility to public transportation." However, in his "Statement of Disputed Facts", which was filed in opposition to the County's motion for summary judgment, there is nothing about FSF's program. Nevertheless, the record does contain basic information about the program. J.A. 456-57.

9