*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 08a0329p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

ODIS TUCKER, VONNIE TUCKER, and BLAKE
TUCKER,

               *Plaintiffs-Appellants,*

    *v.*

STATE OF TENNESSEE,

               *Defendant,*

HARDIN COUNTY, a political subdivision of the State
of Tennessee, and SAVANNAH POLICE DEPARTMENT,
               *Defendants - Appellees.*

No. 06-6208

---

Appeal from the United States District Court
for the Western District of Tennessee at Jackson.
No. 05-01046—James D. Todd, District Judge.

Argued: July 25, 2007

Decided and Filed: August 29, 2008

Before: KEITH and GRIFFIN, Circuit Judges; VAN TATENHOVE, District Judge.[*]

---

## COUNSEL

**ARGUED:** William J. Brown, WILLIAM J. BROWN & ASSOCIATES, Cleveland, Tennessee, for Appellants. Jon A. York, PENTECOST & GLENN, Jackson, Tennessee, Dale Conder, Jr., RAINEY, KIZER, REVIERE & BELL, Jackson, Tennessee, for Appellees. **ON BRIEF:** William J. Brown, WILLIAM J. BROWN & ASSOCIATES, Cleveland, Tennessee, for Appellants. Jon A. York, Brandon O. Gibson, PENTECOST & GLENN, Jackson, Tennessee, Dale Conder, Jr., RAINEY, KIZER, REVIERE & BELL, Jackson, Tennessee, for Appellees.

    VAN TATENHOVE, D. J., delivered the opinion of the court, in which GRIFFIN, J., joined. KEITH, J. (pp. 15-17), delivered a separate opinion concurring in part and dissenting in part.

---

[*] The Honorable Gregory F. Van Tatenhove, United States District Judge for the Eastern District of Kentucky, sitting by designation.

---

**OPINION**

---

VAN TATENHOVE, District Judge.  The Appellants challenge the district court's grant of summary judgment in favor of two government entities as to their claims for accommodation under the Americans with Disabilities Act at the arrest, post-arrest detention, initial appearance, and dispositional hearing on their charges.  Generally, the district court determined that either the actions at issue were not covered by the ADA and/or that the communication provided was as effective as that available to non-disabled persons.  Because we find that the Appellants' rights were not violated, we affirm.[1]

**I.**

The Tuckers are all deaf and mute, and are related either by marriage or sanguinity.  Lauren and Blake are husband and wife.  Vonnie is Blake's mother, and Odis his uncle.  On Sunday, February 29, 2004, the City of Savannah Police Department ("City Police") received a call regarding a domestic dispute at the home of Donna Spears, Lauren's mother.  Blake had driven to Tennessee from Alabama to pick up his wife, Lauren, and their small child from Donna's home.  A disagreement arose as to whether Lauren desired to return to Alabama with Blake, and a neighbor phoned the City Police.  When they arrived, it became clear that the Tuckers suffered from a hearing and speech impairment.  Consequently, the officers utilized a pen and paper to communicate.  After these written discussions with Lauren,[2] who initially was reluctant to engage the officers, it appeared the matter was resolved and Lauren would leave with Blake.

Although the exact circumstances surrounding their departure are not clear, it appears that Blake got into an altercation with a neighbor, Judy Crotts.  One of the officers, Officer Pope, saw Blake strike Ms. Crotts, and push Ms. Spears.  Officer Pope then attempted to restrain Blake and place him under arrest.  Blake responded by striking Officer Pope.  Although Blake disputes that he *intentionally* assaulted Ms. Crotts, he concedes she fell down and started screaming.  As for Officer Pope, Blake admits he struck him, but again disputes that it was intentional.  After witnessing two assaults, Officer Pope arrested Blake and charged him with resisting arrest, assault, assault on an officer, and disorderly conduct.

Odis apparently came towards the police officers during Blake's arrest with his fists clenched.  Consequently, he was also arrested on charges of interference with an officer, disorderly conduct, and resisting arrest.

After their arrests, the City Police transported Blake and Odis to the Hardin County Jail.  There, Odis and Blake requested a TDD/TTY telephone to make a phone call.  Although the jail did not have the requested technology, the jailers allowed Blake and Odis to phone Vonnie, who talked with them by way of a relay operator.  To facilitate effective communication for Blake and Odis, the jailers translated on their behalf through relay operators for over forty-five minutes.  Blake and Odis were detained overnight until their initial appearance the following morning.

---

[1] This Court has jurisdiction pursuant to 28 U.S.C. § 1291 because the district court's grant of summary judgment was a "final decision."  Jurisdiction in the district court was proper under 28 U.S.C. § 1331 because the claims under the ADA raise a federal question.

[2] The Tuckers claim that Lauren requested an interpreter during this conversation, but to the extent Lauren has forgone any claims, this point is irrelevant here, and further had no impact on the district court's analysis of the remaining Tuckers' claims.

As was typical for the jurisdiction, those individuals entitled to an initial appearance were placed on the criminal docket. In turn, each case, including the Tuckers', was set and called that morning. Judge Smith, who presided over the proceeding, recognized that Odis and Blake suffered from a hearing impairment. He discerned their impairment based on the sounds they were making and their mannerisms while awaiting arraignment. Accordingly, he moved their proceedings to the end of the docket so that he could communicate more effectively with them because a sign language interpreter was not present that morning. Although the Tuckers claim they requested a sign language interpreter while at the jail, Judge Smith testified that the first time he learned that Odis and Blake were hearing impaired was when they appeared at the Monday morning hearing.

Through a court official, Odis and Blake were provided a written card containing their rights, they nodded their understanding, wrote a plea of "not guilty" on a piece of paper, and Judge Smith released them both on their own recognizance pending further hearing. The matter was then set for hearing on March 19. The state court received notification that an attorney, Rusty Larsen, had been retained to represent Odis and Blake. In a letter to Judge Smith, Mr. Larsen advised that a sign language interpreter would be "appreciated" for the March 19 hearing. After learning that an interpreter could not be obtained for that particular date, Judge Smith called Mr. Larsen, as counsel for Odis and Blake, and offered to continue the hearing. The Tuckers do not dispute these facts, nor does the record refute them, although Mr. Larsen does not recall the telephone conversation with Judge Smith. The record, however, contains phone records showing the call made from Judge Smith to Mr. Larsen's office.

Further, in his deposition, Mr. Larsen admits that, after consultation with his clients, Blake and Odis decided not to postpone the March 19 hearing because they anticipated entering a guilty plea to the charges against them. Specifically, he testified that he advised his clients that no interpreter would be available at the March 19 hearing, and they declined to request a continuance; rather, they attended with the anticipation that an agreement could be reached regarding the charges. Mr. Larsen testified that he met with his clients on the morning of March 19, in advance of the hearing where they discussed the potential plea, and made the final, voluntary decision to proceed that morning without an interpreter.

Ultimately, the charges against Odis were dismissed in advance of the hearing. Through his counsel, Blake entered a guilty plea to reduced charges and was placed on a diversionary program. During this proceeding, Vonnie voluntarily acted as a translator between Odis, Blake, Mr. Larsen, and the state court. This request was made by Mr. Larsen. Again, the Tuckers do not dispute Mr. Larsen's testimony or the veracity of the chain of events. Instead, they now claim that they felt that they had no choice but to enter the plea because they did not believe an interpreter would be provided at a subsequent hearing. In addition, they make general allegations of "confusion" regarding the proceedings.

Based on the foregoing, the Tuckers filed this civil rights action against the Appellees. Specifically, Odis and Blake claim that the City Police discriminated against them in violation of the ADA by failing to provide a qualified sign language interpreter or other such reasonable accommodation(s) during their arrest following the domestic disturbance call. Next, Odis and Blake allege that the City Police violated their civil rights by failing to have available and/or provide a TDD/TYY telephone at the jail where Odis and Blake were detained pending an initial appearance. Finally, Odis and Blake claim that Hardin County violated the ADA when the state court judge failed to provide a sign language interpreter at either the initial appearance or the dispositional hearing on the criminal charges asserted against them in state court. Vonnie asserts that the state court judge's use of her services as an interpreter during the dispositional hearing likewise violated her civil rights under the ADA. Both Hardin County and the City Police moved for summary judgment on all claims, and these motions were granted.

The district court concluded that Vonnie's claim against Hardin County failed because she *voluntarily* served as an interpreter at the dispositional hearing on Odis and Blake's criminal charges. Her service was requested in light of her sign language skills and not for any discriminatory purpose. The lower court disposed of Blake and Odis' claims in accordance with the temporal event upon which they claimed discrimination.

With respect to the arrest, the district court held that the City Police, in arresting Blake and Odis, were not performing a "service, program, or activity" to which the ADA applied, or that even if they were, any denial was not intentionally because of their disabilities. The opinion relied on the rationale of other jurisdictions holding that, in such a context, the "arrest" was not the type of activity covered by the ADA. Although not explicitly held, it appears the court reasoned that, even if the ADA applied to the arrest, there was no intentional discrimination based on their hearing impairment.

By separate order, the district court reached two conclusions regarding the post-arrest detention at the jail. First, the court concluded that the brief detention was not a "service, activity, or program" within the meaning of the ADA. Second, it reasoned that even if the detention was covered by the ADA, Odis and Blake failed to show any injury resulting from the use of the relay operator and that the jail accommodated Odis and Blake in a manner that resulted in communication that was as effective as that received by non-disabled persons.

Next, the lower court concluded that, at the arraignment, Odis and Blake received the same benefits of an "initial appearance" under Tennessee law as those afforded to non-disabled persons, despite the unavailability of a sign language interpreter. Accordingly, no ADA violation occurred.

Finally, the district court held that Odis did not have standing to assert ADA claims related to the dispositional hearing given that the charges were dropped against him and he did not participate in it. As for Blake, the court relied heavily on the fact that he, with the advice of counsel, declined a continuance, and chose to attend the hearing and plead guilty knowing that an interpreter would not be present, but could be available at a later date without detriment to him. Admittedly, Blake had the right to an interpreter, but the court held he could not sue on that right once he refused the accommodation.

Each of these findings are challenged as error, and the Tuckers appeal the grants of summary judgment by the district court. Because summary judgment is intrinsically a fact-intensive analysis requiring *de novo* review, we examine the record as did the district court to determine the appropriate application of the ADA at each stage of the criminal process experienced by the Tuckers.

## II.

## A.

We review legal conclusions *de novo*. Because a grant of summary judgment is made as a matter of law, the district court's grant of summary judgment is reviewed *de novo*. *See DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir. 2004); *Thompson v. Williamson County, Tennessee*, 219 F.3d 555, 557 (6th Cir. 2000). In other words, we apply the same standard as that applied by the district court.

Federal Rule of Civil Procedure 56(c) provides that judgment for the moving party is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See also Browning v. Dep't of Army*, 436 F.3d 692, 695 (6th Cir. 2006) (citations omitted). While all inferences are drawn in favor of the non-moving party, that party still must present some affirmative evidence supporting its position to defeat an otherwise appropriate motion for summary judgment. *See id.*; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-587 (1986) (non-movant must "do more than

simply show there is some metaphysical doubt as to the material facts") (citations omitted); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-325 (1986). Stated alternatively, "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986). Importantly, "[t]he trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.* 886 F.2d 1472, 1479-1480 (6th Cir. 1989) (citation omitted).

## B.

Congress enacted the Americans with Disabilities Act ("ADA") with the noble purpose of "provid[ing] a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). A person is disabled under the ADA if he or she has "a physical or mental impairment that substantially limits one or more of the major life activities of such individual; [has] a record of such an impairment; or [is] regarded as having such an impairment." 42 U.S.C. § 12102(2)(A)-(C). Title II provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132; *see also Tennessee v. Lane*, 541 U.S. 509, 517 (2004); *Thompson v. Williamson County, Tennessee*, 219 F.3d 555, 557 (6th Cir. 2000). Further, it defines a "qualified individual with a disability" ("QID") as one:

> who, with or without reasonable modifications to rules, policies, or practices, the removal of architecture, communication, or transportation barriers or the provision of auxiliary aids and services, *meets the essential eligibility requirements for receipt of services or the participation in programs or activities* provided by a public entity.

42 U.S.C. § 12131(2) (emphasis added). Consequently, we have held that "the discrimination forbidden by Section 12132 must be with regard to services, programs or activities otherwise it would be quite unclear how we would determine if a plaintiff is a QID." *Johnson v. City of Saline*, 151 F.3d 564, 569 (6th Cir. 1998). Of course, we also have concluded that "the phrase 'services, programs, or activities' encompasses virtually everything a public entity does." *Id.*

This is not to say that there are no limits to the obligations imposed by Title II on public entities.[3] First, we have noted that the requirements of Title II are "subject to the bounds of reasonableness." *Id.* Second, the federal regulations that have been promulgated to effectuate compliance by public entities make clear that the duty upon public entities is not absolute. For example, the ADA "does not require a public entity to take any action that it can demonstrate would result in *a fundamental alteration in the nature of a service, program, or activity or in undue financial and administrative burdens*." 28 C.F.R. § 35.164 (emphasis added). So, to establish a prima facie case of discrimination under the ADA, a plaintiff must prove that:

> "(1) she has a disability; (2) she is otherwise qualified; and (3) she is being excluded from participation in, being denied the benefits of, or being subjected to discrimination under the program solely because of her disability."

*Dillery v. City of Sandusky*, 398 F.3d 562, 567 (6th Cir. 2005) (citing *Jones v. City of Monroe*, 341 F.3d 474, 477 (6th Cir. 2003)). Further, the plaintiff must show that the discrimination was *intentionally* directed toward him or her in particular. *See id.* at 568 ("'[A]cts and omissions which have a disparate impact on disabled persons in general [are] not specific acts of intentional

---

[3]The ADA defines the term "public entity" to include state and local governments, as well as their agencies and instrumentalities. *See* 42 U.S.C. § 12131(1).

discrimination against [the plaintiff] in particular.'") (citing *Tyler v. City of Manhattan*, 118 F.3d 1400, 1403 (10th Cir.1997)). If the plaintiff meets these requirements, then the burden shifts to the defendant to show that the accommodation provided was either effective,[4] or that the accommodation sought and not provided would have resulted in a fundamental alteration of the procedures or an undue financial or administrative burden. *See e.g.*, *Lane*, 541 U.S. at 532.

In this case, the Tuckers are deaf and mute; therefore, the question becomes whether appropriate axillary aids were provided. Title II defines "auxiliary aids and services" to include "qualified interpreters or other effective methods of making aurally delivered materials available to individuals with hearing impairments." 42 U.S.C. § 12102(1)(A). Similarly, the enabling regulations provide that "auxiliary aids and services" include, among other things, "[q]ualified interpreters" and "telecommunications devices for deaf persons (TDD's)." 28 C.F.R. § 35.104(1). And, finally, the public entity typically is required to consider the QID's request, "unless it can demonstrate another effective means of communication exists or that use of the means chosen would not be required under § 35.164." *Bircoll v. Miami-Dade County*, 480 F.3d 1072, 1082 (11th Cir. 2007) (citing 28 C.F.R. pt. 35, app. A); *see also* 28 C.F.R. § 35.160(b)(2) ("In determining what type of auxiliary aid and service is necessary, a public entity shall give primary consideration to the requests of the individual with disabilities.").

As a preliminary matter, we assume, because the parties agree, that the Tuckers are qualified individuals under the ADA. Second, the parties stipulate that the Tuckers have met the first two prongs of the prima facie case of discrimination. Therefore, we need only consider whether each Appellant has established that he or she was *intentionally* "excluded from participation in, being denied the benefits of, or being subjected to discrimination under the program *solely because of* [his or] her disability." *Dillery*, 398 F.3d at 567 (citations omitted) (emphasis added). If we find that each individual has met his or her burden, we must then determine whether these public entities provided a reasonable means of communication that was as effective as those received by non-disabled persons. 28 C.F.R. § 35.160. In addition, there is no ADA violation if the public entity can show that the accommodation requested by the Tuckers would "result in a fundamental alteration in the nature of a service, program, or activity" or "undue financial and administrative burdens." *See* 28 C.F.R. § 35.164.[5]

*1.*

Vonnie Tucker asserts that the state court judge's use of her services as an interpreter during the dispositional hearing violated her civil rights under the ADA. The district court concluded that Vonnie's claim against Hardin County failed because she *voluntarily* served as an interpreter at the dispositional hearing on Odis and Blake's criminal charges. Her service was requested in light of her

---

[4](a) A public entity shall take appropriate steps to ensure that communications with applicants, participants, and members of the public with disabilities are as effective as communications with others.

(b)(1) A public entity shall furnish appropriate auxiliary aids and services where necessary to afford an individual with a disability an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity conducted by a public entity.

(2) In determining what type of auxiliary aid and service is necessary, a public entity shall give primary consideration to the requests of the individual with disabilities.

28 C.F.R. § 35.160.

[5]The dissent contends that the question of whether an entity may be excused under this provision a "factual one that should be addressed by a jury." Because our decision rests on the reasonableness and effectiveness of the communication actually provided to the Tuckers, we do not address this issue.

sign language skills and not for any discriminatory purpose. This finding was not in error. The district court correctly concluded that Vonnie was not denied the benefit of any "service, program, or activity" because of her disability. In fact, she provided a service by agreeing to be an interpreter at the dispositional hearing. If she was uncomfortable in such a role, she didn't have to perform it. Further, and most importantly, she performed this role at the request of counsel for the Tuckers and not the state court. Accordingly, she fails to demonstrate any *intentional* discrimination, and thus no cognizable injury. Simply put, she was not personally denied the benefit of anything being provided by Hardin County to her because of her disability.

*2.*

Odis and Blake Tucker challenge the grant of summary judgment in favor of the City Police as it relates to their arrest. Odis and Blake claim that the City Police discriminated against them in violation of the ADA by failing to provide a qualified sign language interpreter or other such reasonable accommodation(s) during the domestic disturbance call that resulted in their arrest.[6] The district court found that the City Police, in arresting Blake and Odis, were not performing a "service, program, or activity" to which the ADA applied. Further, it concluded that even if the arrest was an ADA-covered activity, the Tuckers failed to show any intentional denial of benefits solely because of their disabilities.

As an initial matter, the language of the statute does not specifically enumerate whether an "arrest" is a "service, program, or activity" contemplated by the ADA.[7] In determining that it is not, the district court noted the lack of guidance from this circuit, and proceeded to conduct a "fact specific" analysis consistent with that of other courts having considered similar facts.

For example, in *Rosen v. Montgomery County, Maryland*, 121 F.3d 154 (4th Cir. 1997), the Court of Appeals for the Fourth Circuit concluded that a drunk driving arrest did not fall within the ambit of the ADA because an arrest was not a service, program, or activity voluntarily provided by the police, or one which the disabled individual could or would voluntarily participate in to achieve some benefit. Specifically, the *Rosen* Court found that the essential eligibility requirements of an arrest assume a voluntariness in their participation that contradicts the very circumstances, and lack of voluntariness, which usually surround an arrest. *Id*. at 157. In other words, a conclusion which finds a person's criminal behavior meets the eligibility requirements implicating the ADA distorts both the language and intent of the statute. *See id*.

The Fourth Circuit went on to consider whether auxiliary aids should have been made available to Rosen during his arrest, and found that such a requirement would impede the ability of the officers to perform their jobs during on-the-spot, in-the-field arrest. *See id*. ("The police do not have to get an interpreter before they can stop and shackle a fleeing bank robber, and they do not have to do so to stop a suspected drunk driver, conduct a field sobriety test, and make an arrest."). The *Rosen* court ultimately concluded that the plaintiff failed to show that the use of auxiliary aids would have changed the events in any way, and further noted that the criminal justice system itself provides adequate protections for an invalid arrest (e.g., suppression of evidence). *See id*. at 157-158; *Patrice v. Murphy*, 43 F. Supp. 2d 1156, 1160 (W.D. Wash.1999) (finding that arrests often involve

---

[6]Odis and Blake also allege that the City failed to complete the self-evaluation required under the ADA. Any such failure, if it is exists, is a different cause of action that the one presented here. *See e.g*, 42 U.S.C. § 1983.

[7]Notably, the U.S. Supreme Court has held that state prisons fall within the ADA, however, that opinion does not address the situation, like the one presented here, where officers are conducting an arrest, or an arrestee is being detained pre-arraignment. *See Pennsylvania Dept. of Corrections v. Yeskey*, 524 U.S. 206, 210-211 (1998).

and require immediate responses from law enforcement such that the ADA applies to an arrest "only where the arrestee was subjected to discrimination because of his disability").

Although not cited by the district court, the Eleventh Circuit recently considered facts strikingly similar to those here and found no ADA violation. In *Bircoll v. Miami-Dade County*, 480 F.3d 1072 (11th Cir. 2007), Bircoll, a hearing impaired individual, brought suit against several public entities alleging that they violated the ADA by failing to obtain an interpreter before performing field sobriety tests on the highway subsequent to a DUI stop. In rejecting Bircoll's claims, the appellate court considered the temporal and factual circumstances surrounding the events. The court concluded that such an accommodation, i.e, to wait for an interpreter before performing field tests and making the arrest, was not reasonable given the exigent circumstances presented by a DUI stop, the "on-the-spot judgment required of police," and the public safety concerns inherent in such a stop. *See id.* at 1086. Further, the court found that the communication with Bircoll "was not so ineffective that an oral interpreter was necessary to guarantee that Bircoll was on equal footing with hearing individuals." *See id*. The court noted that while the communication may not have been "perfect," Bircoll was able to understand the officers' directions and perform several of the requested tests.

Likewise, to conclude that an arrest may be an "activity" subject to the ADA does not direct a finding that an interpreter was required here. Each of the Tuckers must show that he or she was *intentionally* discriminated against *solely because of his or her disability* in the context of that public service, activity, or program, or that reasonable accommodations were not made to provide them with communications that were as effective as those provided to non-disabled persons. *See Dillery*, 398 F.3d at 567-568 (citations omitted); *Bircoll*, 480 F.3d at 1085 (noting that the ADA prevents discrimination in all contexts regardless of the presence of a "program, service, or activity"). Assuming all facts in their favor, we believe Odis and Blake fail to meet this burden given the undisputed material facts in the record.

First, neither appellant in this case makes any claim of intentional discrimination as it relates to the arrest. Neither Odis nor Blake challenge the validity of the arrest or the facts supporting it. Odis was placed on pretrial diversion for the charges, and Blake ultimately plead guilty. The City Police were called to a domestic disturbance by a neighbor, Judy Crotts. The record contains no evidence that Ms. Crotts advised of the Tuckers' hearing impairment as part of that call. Once the officers arrived, the situation appeared under control, but subsequently escalated as often happens when familial dynamics are involved. The Tuckers allude to discord between Lauren's mother and Blake, and suggest that she intentionally "created" this situation to keep her daughter and granddaughter from leaving with Blake because she had the ability to speak and hear without impairment. Regardless of the motives of Ms. Spears, there is no dispute that one of the officers observed Blake assault the neighbor, Ms. Judy Crotts. Undoubtedly, this constitutes an unanticipated situation which arose after the officers arrived, but one for which they must be able to respond immediately. Then, Blake admittedly struck one of the officers, and again, necessitated an immediate response. Likewise, Odis attempted to stop the police in their efforts to arrest Blake by running towards the officers flailing his arms. Both Odis and Blake were restrained and placed under arrest without an interpreter being present. The Tuckers were arrested because they assaulted police officers, individual citizens, or attempted to interfere with a lawful arrest and not because they were disabled. *See e.g.*, *Thompson v. Williamson County, Tennessee*, 219 F.3d 555, 558 (6th Cir. 2000) (finding no ADA violation where claimant was denied medical treatment initially because he had to be disarmed by police not because he was mentally disabled). Applying this rationale to the instant facts, we affirm the district court and find no ADA violation.

The Tuckers rest the remainder of their argument on the failure of the City Police to provide effective communication because of a lack of interpreter, but both concede that the officers were effectively communicating with them. Had the situation remained controlled, the officers were communicating effectively with all parties by using a pen and paper. Next, the Tuckers claim that

the City Police failed to advise them of their policy of making sign language interpreters available and that they did not do so, even after the Tuckers requested one. There is no evidence that the provision of auxiliary aids, i.e., a sign language interpreter would have changed the events in any way. *See Rosen,* 121 F.3d at 157-158. Nothing about the aforementioned situation suggests the police could have been prepared for the responses which were required of them, or that the circumstances permitted taking the time to obtain a sign language interpreter. Where, as it occurred in this case, officers are presented with exigent or unexpected circumstances, it would be unreasonable to require certain accommodations be made in light of the overriding public safety concerns. *See e.g.*, *Patrice*, 43 F. Supp. 2d at 1160 ("forestalling all police activity until an interpreter can be located to aid communication with the deaf protagonist would be impractical and could jeopardize the police's ability to act in time to stop a fleeing suspect, physically control the situation, or interview witnesses on the scene."). Further, we rely on and expect law enforcement officers to respond fluidly to changing situations and individuals they encounter. Imposing a stringent requirement under the ADA is inconsistent with that expectation, and impedes their ability to perform their duties.

In sum, the Tuckers' generalized claims that they were arrested because of a miscommunication, if any, goes to the merits of the arrest[8] and not the reasonableness of the accommodations made by the officers. Accordingly, even if the arrest were within the ambit of the ADA, the district court correctly found that the City Police did not intentionally discriminate against Blake or Odis Tucker because of the their disabilities in violation of the ADA.

*3.*

Odis and Blake also challenge the district court's finding regarding their claims against Hardin County during their post-arrest detention at the Hardin County Jail. The jail did not have a TTY phone, and Odis and Blake claim that this failure constitutes discrimination against them under the ADA because they were "booked" without first being permitted to make a phone call in the manner they requested. The district court found in favor of the jail on two alternative grounds: (1) if the detention was covered by the ADA, Odis and Blake failed to show any injury resulted from the use of the jailers to make their phone call from the jail rather than provide a TTY telephone, and (2) that the jail had made good faith efforts to accommodate Odis and Blake in a manner that resulted in communication that was as effective as that received by non-disabled persons. We agree.

Again, the Eleventh Circuit's decision in *Bircoll v. Miami-Dade County* is instructive. Bircoll, a deaf arrestee, also challenged the lack of TDD telephones at the jail during his post-arrest detention as violating the ADA. *Bircoll v. Miami-Dade County*, 480 F.3d 1072, 1087 (11th Cir. 2007). In rejecting the proposition, the court held that the failure of the jail to have the requested TDD phones did not violate the ADA. There, the police officers acted as relay operators so that Bircoll could telephone his girlfriend, and noted that he made calls using the regular phone and left messages in hopes that they would be heard. *See id.* at 1088. Because Bircoll showed no injury, i.e., a failure to effectively communicate, there was no ADA violation.

As an initial matter in this case, we find that the ADA applies to the post-arrest detention at the jail, and note that the parties have stipulated that the Tuckers are qualified individuals. Upon review, however, we conclude that the Tuckers were not *intentionally* discriminated against because of their hearing impairment. Although the jail did not have TTY telephones as standard equipment,

---

[8]We agree that the criminal justice system itself provides adequate protections for an invalid arrest (e.g., suppression of evidence), without implicating a violation of the ADA in this context. Notably, the federal regulations provide that Title II does not "invalidate or limit the remedies, rights, and procedures of any other Federal law, or State or local laws (including State common law) that provide greater or equal protection for the rights of individuals with disabilities or individuals associated with them." 28 C.F.R. § 35.103(b).

Blake and Odis were provided an effective means of communication with relay operators, and permitted to make a phone call. In fact, the phone call lasted nearly forty-five minutes. In essence, the Tuckers, and the dissent, ask this Court to find strict liability simply because the jail failed to provide exactly the auxiliary device they requested - a TTY phone. This is not the law nor do we make it so today.

After their arrest, Blake and Odis were transported to the jail late on a Sunday evening. Once they arrived, they were permitted to make a phone call. Blake and Odis allege that their rights were violated when they were "booked" without first being permitted to make that call. Tennessee Code Ann. § 24-1-211(b)(3) requires that an arrestee be permitted to make a phone call before being "booked" or having their name written down. First, any failure to comply with this statute does not create a cognizable injury under federal law. We have specifically held that this particular Tennessee statute "creates neither a federally protected liberty or property interest." *See Harrill v. Blount County*, 55 F.3d 1123, 1125 (6th Cir. 1995). Nonetheless, we consider the Tuckers claims under the ADA framework.

Blake and Tucker were permitted to make a phone call, although the record is not clear as to when this occurred in the "booking" process. In any event, if the jail failed to permit the phone call prior to booking these particular individuals, there is no evidence in the record to show that the denial was intentionally discriminatory as required to sustain an ADA claim. To the contrary, any delay appears to have been in an effort to find an accommodation for them to ensure they were able to communicate as effectively as non-disabled persons. Then, the jailers assisted the Tuckers in making their requested phone call by utilizing relay operators, and did so for approximately forty-five minutes. To the extent the Tuckers feel their due process rights were violated under the Tennessee Code because they may not have been able to make the call before they were officially "booked," that presents a different cause of action than one under the ADA.

Moreover, since both Blake and Odis were permitted to make a phone call, they were not denied a service or activity at all. In other words, we conclude that reasonable accommodations were made on their behalf. The chief complaint is that the specific auxiliary equipment requested was not available and this failure was intentionally discriminatory. Here, the Tuckers arrived late Sunday evening, and the jailers did not anticipate the arrival of Blake and Odis at the jail. Therefore, the failure to provide or have a TTY phone was not intentionally done in an attempt to discriminate against either of them *because* of their disability, or deprive them of a service that other detainees without a disability would receive. In fact, the jail made more than reasonable efforts to accommodate their disability once they were made aware of it by aiding them in their phone call and providing communication as effective as that provided to non-disabled persons. Nor we assume, as does the dissent, that the jailers were not up to the task. Moreover, the Tuckers cite no authority that the phone call had to be private. In fact, calls made from a jail or other like institution are often monitored by prison officials. Therefore, giving the Tuckers every factual benefit of the doubt, the presence of the jailers during the call had no effect on the Tuckers' rights or opportunities that would be different than that provided to non-disabled persons.

As noted, the Tuckers claim they requested a TTY phone, and allege that the lack of these phones at the jail constitutes a violation of their rights under the ADA. In support, they reference the Department of Justice ("DOJ") website, where in its question and answer section, there are comments regarding the Department's interpretation of the ADA enabling regulations regarding the required accommodations for qualified individuals. But again, after reviewing the record in the light most favorable to the Tuckers, we conclude that they received communication opportunities as effective as those provided to non-disabled persons.

Without conceding that the DOJ comments are binding, the DOJ provision cited by the Tuckers notes that "Arrestees who are deaf or hard of hearing *may* require a TDD/TYY devise for

making outgoing calls." The commentary only suggests that those specific auxiliary devices may be required. It does not mandate their presence. In fact, the enabling regulations themselves note only that the communication must be as effective as that provided to non-disabled persons, and that the requested device should be considered. *See* 28 C.F.R. § 35.160. It does not require that every potential auxiliary device be on standby so that whatever request a particular individual makes can be accommodated. The dissent contends that, in light of the definition provided for auxiliary aids, the assistance the jailers provided by way of the relay operators denied the Tuckers a "qualified" interpreter or appropriate auxiliary aid required by the regulations. This argument both overstates the requirements of the ADA and the literal language of the statute itself. Title II specifically states that an entity must provide "auxiliary aids and services" which include "qualified interpreters or other effective methods of making aurally delivered materials available to individuals with hearing impairments." 42 U.S.C. § 12102(1)(A). While the enabling regulations note what items and services may meet this definition, it is not an exhaustive or exclusive list. *See* 28 C.F.R. § 35.104(1) ("auxiliary aids and services" include, among other things "qualified interpreters" and/or "telecommunications devices for deaf persons (TDD's)"). In fact, to hold as the dissent suggests and require the provision of the specific accommodation required, undermines any consideration of the "reasonableness" or "effectiveness" of the actual communication provided in a given circumstance if the aid provided was not one of those listed in the regulation. We decline to expand the language and requirements of the ADA this far.

Rather, the judicial inquiry is more appropriately on the effectiveness of the communication actually received to ensure that the disabled person receives equal opportunities. *See e.g.*, *Bircoll v. Miami-Dade County*, 480 F.3d 1072, 1088 (11th Cir. 2007). To this end, neither Blake nor Odis allege a concrete injury as a result of the provided accommodation by the jail, or argue that it was not effective in this circumstance, but rather complain generally about the lack of a specific accommodation in the form of the TTY phone. This general allegation is insufficient to establish a claim under the ADA in the Sixth Circuit:

> The failure of Sandusky to install handicapped-accessible sidewalks and to train its employees about the ADA affects all disabled persons, not just Dillery. Thus, Dillery cannot demonstrate that Sandusky intentionally discriminated against her specifically by failing to undertake these actions. "[A]cts and omissions which have a disparate impact on disabled persons in general [are] not specific acts of intentional discrimination against [the plaintiff] in particular."

*Dillery v. City of Sandusky*, 398 F.3d 562, 568 (6th Cir. 2005) (citing *Tyler v. City of Manhattan*, 118 F.3d 1400, 1403 (10th Cir.1997). While we certainly recognize that the accommodation provided to the Tuckers is not ideal, that alone does not make it unreasonable or a violation of the ADA under these facts. *See e.g.*, *Jones v. City of Monroe*, 341 F.3d 474 (6th Cir. 2003) (holding that the specific request made by plaintiff was not required as long as a reasonable accommodation was made). The dissent correctly notes that the determination here is one of fact, and we do not suggest otherwise. As is always the case in the summary judgment context, the district court assumes the facts in favor of the non-moving party and determines whether a material fact exists to create a question appropriate for submission to a jury. This is different than concluding that every factual question requires a jury determination. We rest our decision on these facts. We conclude that the jail did not intentionally discriminate against the Tuckers by failing to have a TTY phone as standard equipment, and further, that the accommodation provided to them was not only reasonable under the circumstances, but allowed them a means of communication that was as effective as that provided to non-disabled persons. Accordingly, the district court did not err in granting summary judgment in favor of Hardin County.

*4.*

The district court concluded that Hardin County was not liable for failing to provide a sign language interpreter at the initial appearance because Odis and Blake received the same benefits of an "initial appearance" under Tennessee law as those afforded to non-disabled persons, despite the unavailability of an interpreter. Again, on these facts, this finding was not error.

We continue to accept the stipulation that these parties are qualified individuals under the ADA, agree that the ADA applies to court proceedings, and that an interpreter shall be provided to aid criminal defendants in effective communication with the courts. *See e.g.*, *Tennessee v. Lane*, 541 U.S. 509, 532 (2004). (citations omitted); *Johnson v. City of Saline*, 151 F.3d 564, 569 (6th Cir. 1998). The question before the district court, and now us, however, is whether the Tuckers suffered intentional discrimination because of their disabilities, and whether reasonable accommodations were provided that allowed them to have communications as effective as non-disabled persons.

The Tuckers rely primarily on Tenn. Code. Ann. § 24-1-211(b)(1) which requires a court to appoint a sign language interpreter in any proceeding in which a deaf person is a defendant. While true, this provision also requires the deaf person to notify the court of the need and make a request for an interpreter from the state court. *See id*. at § 24-1-211(c). Although Blake and Odis claim they made this request at the jail the previous night, there is no evidence on the record before us that they repeated this request at their initial appearance the following morning. Even if the Tuckers made this request of the jailers, absent evidence that this information was communicated to the state court, we cannot hold the court liable for any failure of the jail to relay the information. This is particularly true when it does not appear that the Tuckers themselves made the court aware. Accordingly, it is difficult for us to conclude that the failure of the state court judge to provide one is evidence of intentional discrimination because of their disability. In fact, the evidence shows that, despite their disability and the unavailability of a sign language interpreter, the state court judge made every effort to ensure effective communications for Blake and Odis in accordance with the ADA.

Having concluded that the Tuckers were not denied the opportunity for a service, program or activity because of their disability, we turn to whether they received communication as effective as non-disabled persons. At an initial appearance, a criminal defendant is entitled to three things: (1) opportunity to enter a plea; (2) receive a trial date; and (3) be physically present. Tenn. R. Crim. P. 5, 43. It is beyond dispute that both Odis and Blake Tucker received all of these benefits at their initial appearance. They claim, however, that they did not understand the proceedings and were not properly advised of their rights. These claims, however, are belied by the undisputed evidence. Upon determining that Blake and Odis were hearing impaired based on the sounds they were making in the courtroom during the initial appearance, the judge sent a hand-written note advising that he would move their case to the end of the docket so that he could spend more time with them. At that point, rather than delay their initial appearance and bond hearing, the state court judge communicated with the Tuckers through written notes by way of a court official. Odis and Blake were provided a written card containing their rights, they nodded their understanding, wrote a plea of "not guilty" on a piece of paper, and were provided a trial date. Notably, the Tuckers did not write any request for an interpreter on this note, or any other information which could be construed as a request for an accommodation which was not provided. Based upon these undisputed facts, it cannot be said that Hardin County, through its state court, intentionally discriminated against these individuals because of their disability, or that they did not receive reasonable accommodations which allowed them communication as effective as a non-disabled person.

Had Blake and Odis truly not understood their rights or the fact that they had an opportunity to enter a plea, or been able to effectively communicate, why did they write a "not guilty" plea on a card provided to them? Would Blake and Odis not have entered this same plea had an interpreter been available? Why did they not request an interpreter as part of their written communication with

the court? Thus, it is not clear that Blake and Odis even requested, of the court, an interpreter for this hearing. Even if true, the request to the jail does equate to a request of the court, nor does a failure of the jail to relay this request impute liability to the court if one was not provided. Blake and Odis could have made this request to the court at the initial hearing, or made some effort to communicate this necessity to the court. Instead of entering their "not guilty" plea, they could have written a note requesting an interpreter. They did not. Even still, while a public entity should take a disabled person's requests into account when providing alternative communications, it is not required to meet those exact requests. What is required by the ADA – and what the state court provided in this case – is an alternative which allows disabled persons to communicate as effectively as a non-disabled person. *See* 28 C.F.R. § 35.160.

*5.*

Finally, the failure to procure an interpreter in advance of the hearing was not intentional discrimination against the Tuckers solely because of their disability. In fact, had the court waited for an interpreter, it is possible that Blake and Odis would have been detained longer before any determination on their bond. Surely this not the result the Tuckers seek, or what the law requires.

Next, Blake and Odis claim that the district court incorrectly concluded that the failure to provide a sign language interpreter at the dispositional hearing violated their rights under the ADA. Specifically, the district court held that Odis did not have standing to assert ADA claims related to the dispositional hearing given that the charges were dropped against him and he did not participate in it. We agree. As for Blake, the court found no ADA violation relying primarily on the fact that Blake, with the advice of counsel, declined a continuance, and chose to attend the hearing and plead guilty knowing that an interpreter would not be present until a later date. This is correct as well.

Although the regulations require that persons with disabilities be provided the option of declining an accommodation, *see Olmstead v. L.C. ex rel Zimring*, 527 U.S. 581, 602 (1999), it only stands to reason that the disabled person cannot thereafter sue for an entity's failure to provide such an accommodation. *See Partelow v. Massachusetts,* 442 F. Supp. 2d 41, 49 (D. Mass. 2006) ("Of course, when a plaintiff exercises his statutory right to refuse an accommodation, a defendant may point to that refusal in rebutting the plaintiff's ADA or RA claims.'") (citations omitted).

In this case, Blake had the right to an interpreter at a dispositional hearing, but declined to continue the proceeding to the date when one would be provided. Blake and Odis had retained legal counsel, who advised them of their rights, and who knew an interpreter would not be available on the March 19 date. The state court judge offered to continue the hearing until such time as one could be available. The Tuckers, through their counsel and with his advice, declined this offer. Blake then entered into the plea in a knowing and voluntary way. He himself testified that he knew what he was doing, considered the benefits and burdens of a plea, and made an informed decision to go forward. Blake entered a guilty plea to reduced charges and was placed on a diversionary program. The Tuckers do not dispute this chain of events, but challenge the district court's ruling because they felt that they had no choice but to enter the plea because they did not believe an interpreter would be provided at a subsequent hearing.

In addition, they make general allegations of "confusion" regarding the proceedings. These allegations are belied, however, by Blake's own testimony that he understood the effect of the plea and that it had been explained to him by his retained counsel, Mr. Larsen. In fact, Blake provided detailed deposition testimony regarding the decision-making process he went through regarding the "pros and cons" of entering a guilty plea. Likewise, they voluntarily went forward knowing Vonnie would be the interpreter, and in fact, requested she do so. All evidence in the record demonstrates conscious decisions by Blake Tucker with full knowledge that he had been offered other options. His own subjective disbelief that an interpreter would not be provided is insufficient to establish a cause

of action under the ADA and does not create a genuine issue of material fact to overcome summary judgment.

**III.**

For these reasons, we AFFIRM.

---

### CONCURRING IN PART, DISSENTING IN PART

---

KEITH, Circuit Judge, concurring in part, and dissenting in part. While I concur with the majority concerning most of the claims brought by the plaintiffs in this case, I cannot agree that summary judgment is appropriate for determining whether Hardin County violated the ADA by denying Plaintiffs Blake and Odis Tucker the equal opportunity to a phone call after their arrests.

The Tuckers are deaf and mute, and the question regarding their post-arrest treatment is straightforward: Whether Hardin County may, under the ADA, use jail officials to carry out the phone call guaranteed to the Tuckers by Tennessee law, rather than providing an acceptable auxiliary device? To dismiss this complaint without allowing a reasonable jury to address this question is entirely premature.

Summary judgment is appropriate only "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In making this determination, we draw all inferences in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

There are two genuine disputes of material fact that support denial of Hardin County's claim at the summary judgment stage: (1) whether the accommodation provided to the Tuckers was adequate; and (2) whether providing an acceptable auxiliary telecommunication device for the deaf ("TDD"), such as a teletypewriter ("TTY") phone, would cause Hardin County undue hardship.

### I. Whether Hardin County provided an adequate auxiliary aid or service

The ADA demands that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation." 42 U.S.C. § 12182(a). This protection extends to those detained in a county jail. *See Penn. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210, 118 S. Ct. 1952, 141 L. Ed. 2d 215 (1998) ("State prisons fall squarely within the statutory definition of 'public entity.'"). The ADA also requires public entities to provide accommodations that allow disabled individuals to enjoy the same services provided to non-disabled persons. Pursuant to the Department of Justice's Regulation, 28 C.F.R. § 35.160(b)(1), "[a] public entity shall furnish appropriate auxiliary aids and services where necessary to afford an individual with a disability an *equal opportunity* to participate in, and enjoy the benefits of, a service, program, or activity conducted by a public entity." (emphasis added). "In determining what type of auxiliary aid and service is necessary, a public entity shall give primary consideration to the requests of the individual with disabilities." *Id*. at § 35.160(b)(2). The definition of auxiliary aids includes:

> Qualified interpreters, note takers, transcription services, written materials, telephone handset amplifiers, assistive listening devices, assistive listening systems, telephones compatible with hearing aids, closed caption decoders, open and closed captioning, telecommunications devices for deaf persons (TDD's), videotext displays, or other effective methods of making aurally delivered materials available to individuals with hearing impairments.

28 C.F.R. § 35.104(1).

The Department of Justice has further clarified the meaning of this policy in its answers to "Commonly Asked Questions About the Americans With Disabilities Act and Law Enforcement," stating:

> Arrestees who are deaf or hard of hearing, or who have speech disabilities, may require a TDD for making outgoing calls. TDD's must be available to inmates with disabilities *under the same terms and conditions* as telephone privileges are offered to all inmates, and information indicating the availability of the TDD should be provided.[1]

A post-arrest phone call is "a service" under the ADA, and Hardin County provides this service to all non-disabled persons who are arrested.[2] Under Tennessee law:

> [n]o person under arrest by any officer or private citizen shall be named in any book, ledger or any other record until after the person has successfully completed a telephone call to an attorney, relative, minister or any other person that the person shall choose, without undue delay.

T.C.A. § 40-7-106(b). Based on this state-mandated post-arrest service, we must therefore assess whether there are any genuine material issues of fact as to whether Hardin County failed to provide the Tuckers with an "*equal opportunity* to participate in [this] . . . service" by "furnish[ing] appropriate auxiliary aids and services[.]" 28 C.F.R. § 35.160(b)(1) (emphasis added).

There is no question in the record that Hardin County recognized that the Tuckers were deaf and mute and yet consciously decided not to provide a TDD device such as a TTY phone. After they were arrested, the Tuckers requested a TTY device. Although the ADA mandates that "[i]n determining what type of auxiliary aid and service is necessary, a public entity shall give primary consideration to the requests of the individual with disabilities," *id*. at § 35.160(b)(2), Hardin County failed to provide a TTY device or even any of the acceptable auxiliary aids listed under 28 C.F.R. § 35.104(1). In fact, in the ten years following the ADA's mandate, the County failed to acquire any of these accommodations for deaf or mute detainees. Rather than furnishing any of these aids, the County provided what the district court characterized as the "assistance of the jailers," untrained and unqualified prison officials. *Tucker v. Hardin County*, 448 F. Supp.2d 901, 906-07 (W.D. Tenn. 2006).

Title II requires that public entities provide "auxiliary aids and services . . . to afford an individual with a disability an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity," 28 C.F.R. § 35.160(b)(1), and there is more than sufficient evidence here that Hardin County may have violated this duty. The majority and the Eleventh Circuit ruling it cites,[3] however, merely gloss over the harms created by Hardin County's approach.

Foremost, it seems highly suspect and potentially very harmful to require deaf and mute detainees to rely on the "assistance of the jailers"—the very officials who placed them under arrest—to carry out the phone call to which these detainees are entitled under Tennessee law. First,

---

[1]"Commonly Asked Questions About the Americans With Disabilities Act and Law Enforcement," *available at* http://www.usdoj.gov/crt/ada/q&a_law.htm (emphasis added).

[2]Interpreting the ADA, this Court has held that "the phrase 'services, programs, or activities' encompasses virtually everything that a public entity does." *Johnson v. City of Saline*, 151 F.3d 564, 569 (6th Cir. 1998) (quoting 42 U.S.C. § 12132).

[3]*Bircoll v. Miami-Dade County*, 480 F.3d 1072 (11th Cir. 2007).

there is no guarantee that an untrained officer would be willing or able to communicate with persons who are both deaf and mute effectively enough to express their ideas in the manner they would be conveyed via telephone or TTY call. The regulation defining auxiliary aids includes "*qualified* interpreters, note takers, [and] transcription services," and nothing in the record suggests that the officers used to make the phone calls here received any training in communicating with deaf and mute persons. 28 C.F.R. § 35.104(1) (emphasis added).

Second, for the same reason non-disabled detainees are guaranteed opportunities to place phone calls—and are not merely asked to provide jail officials with phone numbers to call on their behalf—a reasonable jury could easily conclude that the ADA requires Hardin County to give deaf and mute detainees an "equal opportunity" to place calls themselves. Just as we are unwilling to excuse the absence of wheelchair ramps in situations in which individuals could be physically carried in and out of buildings, a reasonable jury could find that the ADA does not excuse the absence of TDD accommodations simply because officers offer to make calls on behalf of disabled individuals. And a reasonable jury could also conclude that such an approach might not only be harmful to the Tuckers, but would also seem to undermine the ADA itself.

The assessment of Tuckers' differential treatment versus non-deaf and non-mute detainees and the extent to which they were harmed are genuine issues of material fact. These considerations must be assessed by a jury and are therefore inappropriate for summary judgment.

## II. Whether providing a TTY phone would be unduly burdensome

Hardin County may be excused from providing any of the appropriate accommodations required by law if doing so would cause "undue financial and administrative burden[]," 28 C.F.R. § 35.164. Again, however, this assessment is a factual one that should be addressed by a jury. In a recent case, the Tenth Circuit denied a defendant county's summary judgment motion against a hearing impaired individual's lawsuit for denial of access to a TTY device after his arrest. *Robertson v. Las Animas County Sheriff's Dep't*, 500 F.3d 1185, 1196 (10th Cir. 2007). Unlike the majority, the Tenth Circuit properly found that the question of whether requiring TTY phones to arrestees causes undue financial and administrative burden "present[ed] a question of fact." *Id*. at 1199.

The TTY device was designed precisely for the purpose the plaintiffs in *Robertson* and this case envision. Despite the availability of such options, Hardin County failed to provide a TTY device or any of the other eleven alternatives mentioned under 28 C.F.R. § 35.104(1). In refusing to require any of these accommodations when they are so obviously necessary and so easily available, the majority takes a step backward in our efforts to uphold the rights of disabled individuals guaranteed by the ADA. While my colleagues may disagree on the question of whether using an officer to make a post-arrest call for hearing-impaired or mute detainees is an appropriate "auxiliary aid and service," it is clear that such an assessment is a factual one that is to be addressed by a jury.

For these reasons, I dissent from this portion of the majority's ruling.