**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

ROBERT SEREMETH, JR.; ROBERT
SEREMETH, JR., for the minor
children A.S., C.S., E.S., F.S.,
          *Plaintiffs-Appellants,*

v.

BOARD OF COUNTY COMMISSIONERS
FREDERICK COUNTY, MARYLAND;
SHERIFF CHARLES JENKINS; TRAVIS
L. ROHRER, Deputy Sheriff,          No. 10-1711
          *Defendants-Appellees,*

and

FREDERICK COUNTY SHERIFF'S
DEPARTMENT; STATE OF MARYLAND;
STATE OF MARYLAND, Douglas S.
Gansler, Attorney General,
                    *Defendants.*

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Benson Everett Legg, District Judge.
(1:09-cv-00058-BEL)

Argued: January 25, 2012

Decided: March 12, 2012

Before KING, GREGORY, and FLOYD, Circuit Judges.

Affirmed by published opinion. Judge Gregory wrote the opinion, in which Judge King and Judge Floyd joined.

---

**COUNSEL**

**ARGUED:** Monisha Cherayil, PUBLIC JUSTICE CENTER, Baltimore, Maryland, for Appellants. Sandra Diana Lee, KARPINSKI, COLARESI & KARP, PA, Baltimore, Maryland, for Appellees. **ON BRIEF:** Daniel Karp, KARPINSKI, COLARESI & KARP, PA, Baltimore, Maryland, for Appellees.

---

**OPINION**

GREGORY, Circuit Judge:

Robert Seremeth appeals the district court's ruling of summary judgment for the defendants-appellees. Seremeth argues that he was entitled to have the jury hear his argument that he was not reasonably accommodated by the Appellees during their investigation, in violation of his rights under the Americans with Disabilities Act ("ADA") and the Rehabilitation Act. For the reasons that follow, we affirm the district court's order.

I.

On January 13, 2008, Seremeth was at home in Middletown, Maryland, with his four children and his parents. Seremeth, his children, and his parents are deaf. Seremeth and his daughter had an argument about whether the daughter had to go to bed, which followed an earlier incident that day when Seremeth told the daughter that she was not allowed to use the videophone to call her mother, Dawn Rood. The daughter then ran away from home, and Seremeth retrieved her from

a nearby field 15 or 20 minutes later. The daughter then contacted Rood using a videophone. Rood placed a 9-1-1 call to the Frederick County Sheriff's Department because she claims she saw Seremeth hit their daughter. During the 9-1-1 call, Rood told the operator that the family is deaf and there were no weapons at the house.

The parties differ somewhat on their accounts of the encounter that followed between the sheriff's office and Seremeth and his family. The facts in the light most favorable to Seremeth, however, show the following. Prior to the deputies' arrival at Seremeth's house, dispatch warned the deputies that the entire family is deaf and advised them to use their headlights to alert the residents of their presence. Sheriff's deputies had been to Seremeth's house on three or four occasions for alleged domestic disputes. In each of the previous instances, Seremeth was able to communicate with the deputies with notes, and he was not charged with an offense. On one such occasion, a neighbor's daughter served as an interpreter. This time, the dispatcher contacted Meg Ryan, an officer of the Frederick City Police Department who was learning American Sign Language ("ASL"), to help communicate with Seremeth.

Upon arriving at Seremeth's house, the deputies shined their flashlights into the house to get the family's attention. Seremeth opened the door. The officers entered with guns drawn, one with his weapon aimed at Seremeth. Deputy Travis Rohrer ordered Seremeth via hand motions to drop the remote control that he was holding. Rohrer then handcuffed Seremeth's wrists behind his back. The deputies forced him to kneel outside on a cement walkway. This, Deputy Rohrer testified, was standard procedure for a domestic violence call. The handcuffs prevented Seremeth from writing notes or signing, so the deputies could not effectively interview Seremeth, and Seremeth could not ask why he was being detained. Seremeth tried to communicate vocally with the officers, and the officers responded by putting their fingers to their lips, indi-

cating that Seremeth should remain silent. While Seremeth was outside and handcuffed for 30-45 minutes without shoes or a coat, an unknown officer gave him a note saying that the situation would be explained to him and that an interpreter was being called to the scene. The officers did not tell Seremeth why they were there.

The deputies woke the sleeping children and interviewed them without a qualified sign language interpreter. The sheriff's office has professional qualified-interpreter services available to it by contract with Maryland Interpreting Services, d/b/a WeInterpret. The contract provides for an emergency interpreter to arrive within one hour of the request. Seremeth was brought inside, and Seremeth's father, who is somewhat able to read lips and speak understandably, attempted to interpret for Seremeth and the officers. Ryan arrived 45 minutes into the encounter, carrying her ASL course book. Her efforts to communicate failed because of her lack of fluency. Through the questioning, with Seremeth's father as an interpreter, and more than an hour into the encounter but about ten minutes after Ryan had arrived, the deputies determined no abuse had occurred, and they left.

Seremeth claims he suffered "emotional issues" and "persistent anger" because the county "violated [his] right to communicate" by handcuffing him behind his back and failing to explain their presence. J.A. 43-44, 72-80, 90-92. Seremeth and his children sought counseling. Seremeth claims he still has an emotional scar from the experience.

On January 12, 2009, Seremeth filed suit in the District Court for the District of Maryland against Frederick County Deputy Sheriff Travis Rohrer, Frederick County Sheriff Charles Jenkins, and the Board of County Commissioners of Frederick County (collectively, the "Appellees") for violations of the Rehabilitation Act and Title II of the ADA. The district court granted the Appellees' motion for summary judgment and denied Seremeth's motion for summary judg-

ment. *Seremeth v. Bd. of County Comm'rs of Frederick County*, No. 09-58, 2010 WL 2025551 (D. Md. May 18, 2010). The district court concluded that the ADA and the Rehabilitation Act do not apply to police investigations and detentions, and even if they did, they did not require the provision of auxiliary aids and services as a reasonable accommodation in this case. *Id.* at *3. This appeal followed.

## II.

Because this is an appeal from an order of summary judgment, we review de novo the district court's legal determinations. *EEOC v. Fairbrook Med. Clinic*, 609 F.3d 320, 327 (4th Cir. 2010). We can affirm the grant of summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits," when construed in favor of the non-moving party, "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *EEOC v. Cent. Wholesalers, Inc.*, 573 F.3d 167, 174 (4th Cir. 2009) (quoting FED. R. CIV. P. 56(c)). We must reverse if there is an issue of triable fact. *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 291 (4th Cir. 2010).

The "public services" subchapter of the ADA, 42 U.S.C. § 12131, provides, "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." *Id.* § 12132. "Discrimination" includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." *Id.* § 12112(b)(5)(A) (from Title I's definition); *see also Paulone v. City of Frederick*, 787 F. Supp. 2d 360, 372 (D. Md. 2011) (discussing the equivalence of "reasonable accommodations" and "reasonable modifications").[1]

---

[1]Claims under the ADA's Title II and the Rehabilitation Act can be combined for analytical purposes because the analysis is "substantially the same." *Doe v. Univ. of Md. Med. Sys. Corp.*, 50 F.3d 1261, 1265 n.9 (4th Cir. 1995).

While it is undisputed that Seremeth has a disability and is a "qualified individual," the question remains whether the county's criminal investigation is covered by the ADA. If so, we must ask whether he was discriminated against because of a lack of "reasonable accommodations" for his disability. *Id.* § 12112(b)(5)(A). We hold that while police investigations are subject to the ADA's framework, the exigent circumstances involved in a suspected domestic violence situation render the accommodations provided reasonable under the ADA.

A.

Critical to the resolution of whether the ADA applies to an investigation is the Fourth Circuit's decision *Rosen v. Montgomery County*, 121 F.3d 154 (4th Cir. 1997). There, this Court found that there was no violation of the ADA during the arrest of a deaf individual, Jeffrey Rosen, for driving under the influence of alcohol.

The *Rosen* Court relied solely on the fact that the complainant did not establish that he was injured because of his disability. *See id.* at 158 (stating that the "decision to affirm . . . is based on . . . the lack of any discernible injury"). The *Rosen* Court found Rosen's allegations of injury implausible because he merely felt the "emotions experienced by almost every person stopped and arrested for drunk driving." *Id.* In other words, Rosen could not show that he suffered an injury distinct from the embarrassment of being subjected to a roadside DUI stop.

In contrast, Seremeth has established an injury cognizable under the ADA. The communication between Seremeth and the deputies was deficient even though Seremeth wasn't arrested. The injury is the failure to make communication as effective as it would have been among deputies and persons without disabilities. *See* 28 C.F.R. § 35.160 (requiring public entities to "take appropriate steps to ensure that communica-

tions with . . . members of the public . . . with disabilities are as effective as communication with others"). Seremeth has sought counseling to address his "emotional issues [and] persistent anger" stemming from the confrontation. J.A. 80. Unlike *Rosen*, Seremeth's injuries are greater than those "emotions experienced by almost every person" interrogated by the government, *Rosen*, 121 F.3d at 158, because his injuries stemmed from the very failure to communicate—an injury that would not have been inflicted on a person with full hearing capabilities.

Courts across the country have called *Rosen*'s holding into question in light of the Supreme Court's decision in *Penn. Dep't of Corrections v. Yeskey*, 524 U.S. 206 (1998), which interpreted the ADA to cover disabled state inmates who have been discriminated against in correctional programming. *See, e.g.*, *Thompson v. Davis*, 295 F.3d 890, 897 (9th Cir. 2002); *Paulone v. City of Frederick*, 787 F. Supp. 2d 360, 381 (D. Md. 2011) ("[T]he weight of subsequent authority, in the Supreme Court as well the Fourth Circuit and other courts, calls into question . . . reliance on *Rosen*."); *Calloway v. Boro of Glassboro Dep't of Police*, 89 F. Supp. 2d 543, 556 (D. N.J. 2000) (*Rosen*'s reasoning is "now discredited"). These glosses on *Rosen* assume that *Rosen* was decided on broader grounds than it was—perhaps aided in no small part by *Rosen*'s general discussion of the ADA.[2] *See Rosen*, 121 F.3d

---

[2]*Rosen*'s general statements about how the ADA applies to pre-arrest conduct may have been called into doubt by the *Yeskey* case because the Supreme Court rejected the contention that the ADA's words "eligibility" and "participation" imply voluntariness, thereby extending the reach of the ADA to cover a broad swath of governmental activities. *Yeskey*, 524 U.S. at 211. But we are not deciding a wrongful-arrest case today, and *Rosen* is still precedential in the context of reasonable-accommodation cases; it is particularly relevant on the subject of what constitutes an injury under the ADA. Given that "we may affirm a district court's decision on different grounds than those employed by the district court," *Shafer*, 107 F.3d at 275 n.1, we do not rely on the portion of the district court's decision that depends on the "program or activity" discussion in *Rosen*; we can decide this case on reasonable-accommodation grounds.

at 158 ("Rosen was in no way 'denied the benefits of' his arrest." (quoting 42 U.S.C. § 12132)); *compare Gohier v. Enright*, 186 F.3d 1216, 1221 (10th Cir. 1999) ("[A] broad rule categorically excluding arrests from the scope of Title II . . . is not the law."). But, as noted above, *Rosen*'s precedential reach is more properly cast as limited to the injury grounds necessary to reach its conclusion.

Since *Yeskey* and *Rosen*, many of our sister circuits have determined that § 12132's words "or be subjected to discrimination by that entity" are meant to be a "catch-all phrase that prohibits all discrimination by a public entity, regardless of the context," thereby avoiding the difficult semantics of categorizing each governmental action as "services, programs, or activities" in the first part of the disjunctive. *Bircoll v. Miami–Dade County*, 480 F.3d 1072, 1084–85 (11th Cir. 2007); *Barden v. City of Sacramento*, 292 F.3d 1073, 1076 (9th Cir. 2002) ("Rather than determining whether each function of a city can be characterized as a service, program, or activity for purposes of Title II, . . . we have construed the ADA's broad language [as] bring[ing] within its scope anything a public entity does.") (internal quotation marks and citations omitted), *cert. denied*, 539 U.S. 958 (2003); *Reg'l Economic Cmty. Action Program v. City of Middletown*, 294 F.3d 35, 45 (2d Cir. 2002) ("The ADA and the Rehabilitation Act . . . prohibit all discrimination based on disability by public entities."), *cert. denied*, 537 U.S. 813 (2002).

This Circuit has not squarely addressed the issue.[3] The broad approach is appealing. The Department of Justice regulations confirm that "title II applies to anything a public entity does." 28 C.F.R. Pt. 35, App. B; *see also* H.R. Rep. No.

---

[3]In a suit against George Mason University by a law student for a failure to accommodate during an exam, this Court emphasized the disjunctive "or" in the § 12132 language, but it appears the disjunctive test was not necessary to resolve the issue in that case. *See Constantine v. Rectors and Visitors of George Mason Univ.*, 411 F.3d 474, 498 (4th Cir. 2005).

485(II), 101st Cong., 2d Sess. 84 (1990) (stating that Title II is intended to apply to "all actions of state and local governments."). The department's regulations are the agency's interpretation of the statute, and they are therefore given "controlling weight" unless they conflict with other departmental regulations or the ADA itself. *Stinson v. United States*, 113 S. Ct. 1913, 1919 (1993); *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844 (1984).

We need not pick sides in this dispute because, in light of *Yeskey*'s expansive interpretation, the ADA applies to police interrogations under either test. *See Waller v. Danville*, 556 F.3d 171, 174 (4th Cir. 2009) (noting that courts recognize an ADA case is established when "police properly arrest a suspect but fail to reasonably accommodate his disability during the investigation or arrest, causing him to suffer greater injury or indignity than other arrestees.") (citing *Gohier v. Enright*, 186 F.3d 1216, 1220-21 (10th Cir. 1999); *Gorman v. Bartch*, 152 F.3d 907, 912-13 (8th Cir. 1998)); *see also Johnson v. City of Saline*, 151 F.3d 564, 569 (6th Cir. 1998) (finding that "the phrase 'services, programs, or activities' encompasses virtually everything that a public entity does"). While the Supreme Court in the *Miranda* context has said that the Constitution does not require "that the police supply a suspect with a flow of information," *Moran v. Burbine*, 475 U.S. 412, 422 (1986), the ADA applied once the deputies attempted to question and obtain information from Seremeth.

## B.

Having concluded that the ADA applies to the investigation of criminal conduct, we next determine whether the deputies' conduct was reasonable under the circumstances. We find that due to the exigencies inherent in responding to a domestic violence situation, no further accommodations were required than the ones made by the deputies.

This Circuit has previously avoided the issue of whether an exigent-circumstances exception to the ADA exists. *See Waller v. Danville*, 556 F.3d 171, 175 (4th Cir. 2009) ("Whether or when an 'exigent circumstances' constraint upon the ADA exists, however, is a broader proposition than is needed to decide this case."). We find that while there is no separate exigent-circumstances inquiry, the consideration of exigent circumstances is included in the determination of the reasonableness of the accommodation. Most importantly, nothing in the text of the ADA suggests that a separate exigent-circumstances inquiry is appropriate. Furthermore, this view of the ADA has the ancillary benefit of encouraging the provision of accommodations during exigent circumstances.

Seremeth argues that because the deputies did not alter their protocol to allow Seremeth to be handcuffed in front of his body so he could write notes to the deputies and thereby communicate effectively, he was denied reasonable accommodation. Seremeth also claims that because the deputies did not provide a qualified interpreter, they did not reasonably accommodate him. For the following reasons, we reject Seremeth's contentions.

A public entity must "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7). With regard to communication-related disabilities, the regulations require public entities to "take appropriate steps to ensure that communications with . . . members of the public . . . with disabilities are as effective as communications with others," *id.* § 35.160(a)(1), and to "furnish appropriate auxiliary aids and services where necessary to afford individuals with disabilities . . . an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity," *id.* § 35.160(b)(1). "Auxiliary aids or services" are defined by

both statute and regulation. The regulation, which is more exhaustive, provides

> Auxiliary aids and services includes—
>
> (1) Qualified interpreters on-site or through video remote interpreting (VRI) services; notetakers; real-time computer-aided transcription services; written materials; exchange of written notes; telephone handset amplifiers; assistive listening devices; assistive listening systems; telephones compatible with hearing aids; closed caption decoders; open and closed captioning, including real-time captioning; voice, text, and video-based telecommunications products and systems, including text telephones (TTYs), videophones, and captioned telephones, or equally effective telecommunications devices; videotext displays; accessible electronic and information technology; or other effective methods of making aurally delivered information available to individuals who are deaf or hard of hearing;
>
> (2) Qualified readers; taped texts; audio recordings; Brailled materials and displays; screen reader software; magnification software; optical readers; secondary auditory programs (SAP); large print materials; accessible electronic and information technology; or other effective methods of making visually delivered materials available to individuals who are blind or have low vision;
>
> (3) Acquisition or modification of equipment or devices; and
>
> (4) Other similar services and actions.

*Id.* § 35.104 (interpreting 42 U.S.C. § 12103(1)).

The ADA does not easily reduce to a cost-benefit calculation. The intent of the statute is to promote equal access and participation in government services unless such provision causes an "undue burden." In other words, the fact that the provision of auxiliary aids or other such equalizers costs the government money—perhaps more than it would like to spend, or more than the benefit received by the disabled individual—is not a sufficient reason to reject the provision of the aid. But nor can the provision of accommodation trump legitimate law enforcement needs when responding to an emergency situation.

What constitutes reasonable accommodations during a police investigation for a domestic disturbance is a question of fact and will vary according to the circumstances. *See Pandazides v. Va. Bd. of Educ.*, 13 F.3d 823, 833 (4th Cir. 1994). The relevant circumstances, viewed in the light most favorable to the non-moving party, certainly include the following: the sheriff's deputies knew that they were going to a house where deaf people live; the deputies attempted to engage in conversation with a hearing-impaired individual and that attempt to communicate failed; the sheriff's office had a contract for a qualified interpreter; the deputies could have handcuffed Seremeth in front of his body to allow him to write notes; and Seremeth lacked the ability to communicate without notes or the use of his hands to sign.

Nevertheless, as in the criminal procedure context, we are reluctant to question the snap judgments of law enforcement officials in situations in which a reasonable officer would fear for his safety and for the safety of those he is charged to protect. The deputies were responding to a domestic disturbance call, which Deputy Rohrer characterized as "some of the most dangerous calls that we ever go on." J.A. 115. The deputies were obligated to assure themselves that no threat existed against them, Seremeth's children, or anyone else. The deputies could not rely on a phone call claiming that there were no weapons in the house—to do so would be a failure in their

duty and training. Moreover, the exigency justified keeping Seremeth handcuffed behind his back, as is standard procedure in dangerous situations.

The entire encounter took an hour and fifteen minutes before the deputies concluded that there was not probable cause to arrest Seremeth or remove him from his home to protect his children. WeInterpret could have taken up to an hour to provide an interpreter. The deputies were not required to wait until an interpreter arrived in order to perform their duty and attempt to question Seremeth.

Under the circumstances, it was reasonable for the deputies to attempt to accommodate Seremeth's disability by calling Ryan, an ASL trainee, to assist in communication, and by attempting to use Seremeth's father as an interpreter. It was reasonable even though these accommodations were not best practices—practices that in other circumstances could be evidence of a failure to reasonably accommodate.[4] The accommodations afforded to Seremeth by the deputies were reasonable given their overwhelming need to obtain information quickly to protect themselves and others from possible violence. The further accommodations requested by the

---

[4]The *ADA Guide for Law Enforcement*, distributed by the Department of Justice, imagines a scenario strikingly similar to the present case:

> An officer responds to the scene of a domestic disturbance. The husband says the wife has been beating their children and he has been trying to restrain her. The wife is deaf. The officer begins questioning her by writing notes, but her response indicates a lack of comprehension. She requests a sign language interpreter. In this situation an interpreter should be called. . . . **It is inappropriate to ask a family member or companion to interpret in a situation like this** because emotional ties may interfere with the ability to interpret impartially.

DEPARTMENT OF JUSTICE, COMMUNICATING WITH PEOPLE WHO ARE DEAF OR HARD OF HEARING: ADA GUIDE FOR LAW ENFORCEMENT (2006) (emphasis added).

Appellant in his suit would have been unreasonable under the circumstances.

## III.

For the foregoing reasons, the district court's order of summary judgment for the Appellees is

*AFFIRMED*.